**No. 21-15869**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

TWITTER, INC.,

*Plaintiff-Appellant*,

v.

KEN PAXTON, in his official capacity as
Attorney General of Texas,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-01644
(Hon. Maxine M. Chesney)

---

# BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND MEDIA LAW RESOURCE CENTER, INC. IN SUPPORT OF PLAINTIFF-APPELLANT

---

[Caption continued on next page]

Katie Townsend (SBN 254321)
*Counsel of Record*
Bruce D. Brown*
Gabe Rottman*
Mailyn Fidler*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org
** Of counsel*

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Media Law Resource Center has no parent corporation and issues no stock.

## TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ..................................................... iii

TABLE OF AUTHORITIES ..........................................................................v

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE .................1

SOURCE OF AUTHORITY TO FILE ....................................................................2

FED. R. APP. P. 29(a)(4)(E) STATEMENT ............................................................3

SUMMARY OF THE ARGUMENT ........................................................................4

ARGUMENT .............................................................................................................7

I. The *Tornillo* rule is a crucial protection for the free flow of information...........................................................................................7

II. The DTPA poses a significant risk of censorship if used to investigate or enforce the government's conception of viewpoint neutrality online. ...........................................................................................14

III. The suit is ripe for First Amendment purposes. .................................19

CONCLUSION .........................................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*Ariz. Right to Life Political Action Comm. v. Bayless*,
320 F.3d 1002 (9th Cir. 2003)....................19

*Ark. Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987)....................17, 18

*Associated Press v. United States*,
326 U.S. 1 (1945)....................8

*Autohaus, Inc. v. Aguilar*,
794 S.W.2d 459 (Tex. App. 1990)....................17

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)....................18, 20

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988)....................5

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
412 U.S. 94 (1973)....................5

*Connick v. Myers*,
461 U.S. 138 (1983)....................5

*Dombrowski v. Pfister*,
380 U.S. 479 (1965)....................20, 21

*e-ventures Worldwide, LLC v. Google, Inc.*,
No. 2:14-cv-646, 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017)....................12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)....................11, 13

*Jian Zhang v. Baidu.com Inc.*,
10 F. Supp. 3d 433 (S.D.N.Y. 2014)....................6, 11, 12

*La'Tiejira v. Facebook, Inc.*,
272 F. Supp. 3d 981 (S.D. Tex. 2017)....................12

*Langdon v. Google, Inc.*,
474 F. Supp. 2d 622 (D. Del. 2007)....................12

*Majors v. Abell*,
317 F.3d 719 (7th Cir. 2003)....................19

*Meyer v. Grant*,
486 U.S. 414 (1988) ....... 8

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ....... *passim*

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) ....... 18

*Murphy v. Twitter, Inc.*,
274 Cal. Rptr. 3d 360 (Cal. Ct. App. 2021) ....... 17

*N.A.A.C.P. v. Button*,
371 U.S. 415 (1963) ....... 13

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ....... 13

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ....... 9

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017) ....... 11

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
413 U.S. 376 (1973) ....... 8

*Prager Univ. v. Google LLC*,
951 F.3d 991 (9th Cir. 2020) ....... 16, 17

*Reno v. Am. Civil Liberties Union*,
521 U.S. 844 (1997) ....... 11

*Santa Monica Food Not Bombs v. City of Santa Monica*,
450 F.3d 1022 (9th Cir. 2006) ....... 19

*Search King, Inc. v. Google Tech., Inc.*,
No. CIV-02-1457, 2003 WL 21464568 (W.D. Okla. May 27, 2003) ....... 12

*Snyder v. Phelps*,
562 U.S. 443 (2011) ....... 5

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ....... 14

*Van Nuys Publ'g Co. v. City of Thousand Oaks*,
489 P.2d 809 (Cal. 1971) ....... 21

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988).....................................................................20

**Statutes**

15 U.S.C. § 45 .........................................................................................16

**Other Authorities**

2 Zechariah Chafee, Government and Mass Communications (1947) ...................10

Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times, Mar. 24, 1974,
https://perma.cc/2W2J-AJ65...........................................................9

Exec. Order No. 13,925,
85 Fed. Reg. 34,079 (May 28, 2020) ..........................................................16

Leah Nylen et al., *Trump Pressures Head of Consumer Agency to Bend on Social Media Crackdown*, Politico (Aug. 21, 2020),
https://perma.cc/7FLH-WDYP ......................................................16

Lucas A. Powe, Jr., The Fourth Estate and the Constitution (1992)...................9, 10

News Release, AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices (Jan. 13, 2021),
https://perma.cc/YWJ2-3DFQ .......................................................15

News Release, First Assistant AG Jeff Mateer to FTC: Big Tech Companies Must Comply with State Deceptive Trade Practices Law (June 12, 2019),
https://perma.cc/D83P-QF68 ..........................................................15

Office of the Att'y Gen., Consumer Prot. Div., Civil Investigative Demand (Jan. 13, 2021),
https://perma.cc/4FNL-Z47B ..........................................................15

Preliminary Injunction,
*Netchoice v. Moody*, No. 4:21-cv-00220 (N.D. Fla. June 30, 2021).............11

Unopposed Br. of Amici Curiae Reporters Comm. for Freedom of the Press, Am. Civil Liberties Union, Am. Civil Liberties Union of Fla., Authors Guild Inc., Ctr. for Democracy & Tech., Media Law Res. Ctr., Inc., and Pen Am. Ctr., Inc.,
*Netchoice v. Moody*, No. 4:21-cv-00220 (N.D. Fla. June 14, 2021).............10

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

The Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated non-profit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Media Law Resource Center, Inc. ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings. The MLRC also works with its membership to respond to legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues. It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field. The MLRC was founded in 1980 by leading American

publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

Amici collectively represent the First Amendment interests of media outlets and communications platforms across all technologies and the public's interest in receiving and disseminating information free from government censorship or control. Amici submit this brief because the district court's holding that a pre-enforcement challenge to the civil investigative demand challenged here is not yet ripe could impair fundamental First Amendment rights that animate and preserve robust public debate across all media.

## SOURCE OF AUTHORITY TO FILE

Plaintiff-Appellant consents to the filing of this amici brief. Counsel for Defendant-Appellee stated it has no objection to the filing of this amici brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Amici declare that:

1. no party's counsel authored the brief in whole or in part;
2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and
3. no person, other than amici, their members or their counsel, contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF THE ARGUMENT

Any government effort to force what it deems to be viewpoint neutrality on a communications platform carries the temptation to compel platforms to carry speech perceived as favorable to the government, or, at the very least, speech that platforms would not otherwise carry. As such, these efforts pose a profound threat to First Amendment guarantees, including a free and unfettered press. Amici the Reporters Committee and MLRC take no position on Twitter's content moderation policies or practices. Amici, however, share the position that the choice to curate content in this way is fully protected by the First Amendment. Here, Texas Attorney General Ken Paxton explicitly cited Twitter's and other platforms' decisions to label or block political content as the basis for initiating an investigation under Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), and the Office of the Attorney General in Texas has previously expressed support for using deceptive practices laws to police perceived viewpoint discrimination by online platforms.

Accordingly, Amici write to address the following three points in support of Plaintiff-Appellant.

***First***, government efforts to use deceptive practices laws, or other similar regulatory schemes, to investigate perceived "bias" in content moderation would contravene the rule articulated by the Supreme Court in *Miami Herald Publishing*

*Co. v. Tornillo*—that "governmental regulation" of "editorial control and judgment" cannot be "exercised consistent with First Amendment guarantees of a free press." 418 U.S. 241, 258 (1974); *see also Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 510 (9th Cir. 1988) ("The danger inherent in government editorial oversight, even in the interest of 'balance,' is well established.").[1] Under *Tornillo*, it would be improper for the government, regardless of motive, to mandate that a private editor "publish that which reason tells [it] should not be published." 418 U.S. at 256 (internal quotation marks omitted). In its investigation, however, the Office of the Attorney General claims the authority to intervene in political content curation online, in the name of holding platforms to assertions of impartiality or neutrality in that curation. If allowed to proceed, this inquiry could therefore have the effect of undermining the protections for public discourse established in *Tornillo*. *Cf. Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 144–45 (1973) (Stewart, J., concurring) (noting concern that requiring broadcast licensees to carry paid editorial advertising could erode editorial autonomy of print

---

[1] Plaintiff-Appellant's claim for relief is based on a theory of First Amendment retaliation. While Amici have a strong interest in robust First Amendment protections against retaliatory state action, Amici write separately to emphasize that even non-retaliatory government inquiries into a private entity's curation of political content raise profound First Amendment concerns. *Cf. Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983))).

media). And, indeed, cognizant of the importance of the *Tornillo* rule to the free flow of information to the public, courts have persuasively extended that rule to online communications platforms such as search engines and social media. *See, e.g.*, *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 443 (S.D.N.Y. 2014) ("In short, Plaintiffs' efforts to hold [search engine] Baidu accountable in a court of law for its editorial judgments about what political ideas to promote cannot be squared with the First Amendment."). By raising the specter of legal consequences for failing to carry political speech the platforms otherwise would not, the Civil Investigative Demands clearly violate the rule articulated in *Tornillo*.

***Second***, the constitutional right at issue here—the discretion of a private entity to disseminate or not disseminate lawful content without government interference—is particularly vulnerable to regulatory intervention, even in service of what would otherwise be an appropriate exercise of governmental regulatory authority. Further, deceptive practices laws pose special concerns when they trench on decisions by private actors to control political content on their platforms, especially when the government claims the authority to impose a standard of viewpoint neutrality—as it sees it—under the guise of consumer protection. Were the government able to deploy consumer protection laws in this way, it would invariably seek to favor viewpoints perceived as supportive and disfavor viewpoints perceived as critical.

***Third***, a flexible standard for evaluating ripeness in cases seeking to invoke First Amendment protections is an essential check against state overreach for the press and the public at large. While technology platforms may not stand directly in the shoes of the news media, when they exercise editorial discretion in determining which speech to carry, or not, or whether to, for instance, append disclaimers to third-party content, those acts are indistinguishable as a First Amendment matter from a newspaper deciding to run an editorial or a television station deciding which stories to cover for the evening news. Any government inquiry poses a significant threat of chill, and the availability of injunctive relief, even at the pre-enforcement stage, is an indispensable safeguard.

For these reasons, Amici urge the Court to reverse the district court's ripeness determination.

## ARGUMENT

### I. The *Tornillo* rule is a crucial protection for the free flow of information.

Private curation of lawful content online—especially content related to public affairs and government officials—is an inextricable feature of modern, largely online, public discourse.[2] Such private curation necessarily entails making

[2] Amici submit that the express object of the Attorney General's Office's investigation—the labeling and blocking of third-party political speech—receives direct protection under the First Amendment. Amici therefore do not address the application of 47 U.S.C. § 230 in this brief. Core political speech is "an area in which the importance of First Amendment protections is at its zenith." *Meyer v.*

decisions about what material is allowed or disallowed on a platform. In 1974, the Supreme Court unanimously affirmed that the First Amendment forbids governmental interference in editorial decisions by the press when it held unconstitutional Florida's "right of reply" statute, which "grant[ed] a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper." *Tornillo*, 418 U.S. at 243, 258. The Court in *Tornillo* made clear that government regulation of the "choice of material" to include in a newspaper cannot be "exercised consistent with First Amendment guarantees." *Id.* at 258. This conclusion applies when such decisions deal with the "treatment of public issues and public officials—whether fair or unfair." *Id*. Indeed, press autonomy in decisions "about what and what not to publish" has been described as "absolute."

---

*Grant*, 486 U.S. 414, 425 (1988) (invalidating Colorado prohibition on paid petition circulators as violative of First Amendment) (internal quotation marks omitted). Further, this is not a regulation concerning a "classic example[] of commercial speech," *see Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973), nor does it involve the application of a generally applicable law like antitrust against a private speaker, *see Tornillo*, 418 U.S. at 254 (distinguishing *Associated Press v. United States*, 326 U.S. 1 (1945), and noting that the *Associated Press* Court clarified that a district court decree pursuant to Sherman Act "does not compel AP or its members to permit publication of anything which their 'reason' tells them should not be published" (quoting 326 U.S. at 20 n.18)). Rather, the question here is whether communications platforms may present core political speech in the manner that those platforms' "reason" dictates.

*See* Lucas A. Powe, Jr., The Fourth Estate and the Constitution 277 (1992) ("Because editorial autonomy is indivisible, it must be absolute."); *see also* *Tornillo*, 418 U.S. at 259 (White, J., concurring) ("According to our accepted jurisprudence, the First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned." (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971))).

Notably, the unanimous *Tornillo* decision came at the height of fallout from Watergate and shortly after a request by President Richard Nixon that the Justice Department explore the need for a federal "right of reply" statute because of press coverage perceived as critical of public officials. Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times, Mar. 24, 1974, at E2, https://perma.cc/2W2J-AJ65 ("Overhanging the debate is the reality of Watergate, where a vigorous press broke through repeated official White House denials of wrongdoing."). Today, government actions like the Attorney General's Office's investigation are being undertaken against a similar backdrop of claims by politicians that they are being silenced by social media companies, and a flood of legislative proposals that are often expressly described as efforts to counter perceived "bias" in content moderation practices. *See* Unopposed Br. of Amici Curiae Reporters Comm. for Freedom of the Press, Am. Civil Liberties Union, Am. Civil Liberties Union of

Fla., Authors Guild Inc., Ctr. for Democracy & Tech., Media Law Res. Ctr., Inc., and Pen Am. Ctr., Inc., *Netchoice v. Moody*, No. 4:21-cv-00220 (N.D. Fla. June 14, 2021).

Chief Justice Burger's opinion for the Court in *Tornillo* rested on two inevitable consequences of permitting the government to interfere with editorial discretion by mandating access to private print media, which would "bring[] about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years." *Tornillo*, 418 U.S. at 254. First, the specter of a "government [fairness] umpire," Powe, *supra* at 283, would chill public discourse by prompting the news media to "conclude that the safe course is to avoid controversy," *Tornillo*, 418 U.S. at 257. Second, an enforceable right of access poses the threat of direct press censorship:

> [L]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper. A journal does not merely print observed facts the way a cow is photographed through a plateglass window. As soon as the facts are set in their context, you have interpretation and you have selection, and editorial selection opens the way to editorial suppression. Then how can the state force abstention from discrimination in the news without dictating selection?

*Id.* at 258 n.24 (quoting 2 Zechariah Chafee, Government and Mass Communications 633 (1947)).

While the *Tornillo* Court confronted these issues in the context of print media, the Supreme Court has since extended full First Amendment protection to

the internet as a communications medium. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (holding unconstitutional a governmental ban on access to social media and finding that "social media users employ these websites to engage in a wide array of protected First Amendment activity"). The Court has also recognized the application of *Tornillo* "well beyond the newspaper context." *Jian Zhang*, 10 F. Supp. 3d at 437. As the Court has explained, "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569–70 (1995); *see also* Preliminary Injunction at 21, *Netchoice v. Moody*, No. 4:21-cv-00220 (N.D. Fla. June 30, 2021) (finding that although "social-media providers do not use editorial judgment in quite the same way [as a newspaper] . . . [the challenged statute is] concerned instead primarily with the ideologically sensitive cases. Those are the very cases on which the platforms are most likely to exercise editorial judgment. Indeed, the targets of the statutes at issue are the editorial judgments themselves. The State's announced purpose of balancing the discussion—reining in the ideology of the large social-media providers—is precisely the kind of state action held unconstitutional in *Tornillo*, *Hurley*, and *PG&E*.").

Applying those principles, numerous lower courts have held that online platform decisions about what lawful content to host on their sites receive First Amendment protection. *See Jian Zhang*, 10 F. Supp. 3d at 438 (applying protection to search engine judgments about "what information (or kinds of information) to include in the results and how and where to display that information"); *e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) (same); *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457, 2003 WL 21464568, at *2–4 (W.D. Okla. May 27, 2003) (search rankings are protected opinion). Further, these protections apply equally to decisions to remove or exclude content. *See, e.g.*, *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (finding Facebook could decide whether to take down or leave up a post because of "Facebook's First Amendment right to decide what to publish and what not to publish on its platform"); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629–30 (D. Del. 2007) (finding First Amendment right extends to decisions to exclude content from search platform). These protections apply irrespective of the government's intention in seeking to intervene in curation decisions. *See Jian Zhang*, 10 F. Supp. 3d at 438 ("Put simply, '[d]isapproval of a private speaker's statement'—no matter how justified disapproval may be—'does not legitimize use of the

[government's] power to compel the speaker to alter the message by including one more acceptable to others.'" (quoting *Hurley*, 515 U.S. at 581)).

The animating concern in *Tornillo*—that the power to compel or silence speech on a communications medium would allow the government to improperly skew public discussion of its policies through chill or direct suppression—applies when the government seeks to dictate how private entities moderate lawful content online. Government intrusion into such decisions "dampens the vigor and limits the variety of public debate." *Tornillo*, 418 U.S. at 257 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)). As much of that public debate has moved to the internet, the application of federal and state regulatory regimes like tax, and, as here, consumer protection laws, must be appropriately calibrated to preserve the "breathing space" it needs to survive. *Sullivan*, 376 U.S. at 272 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963)).

In short, if a major purpose of the First Amendment is to allow public discourse to "serve as a powerful antidote to any abuses of power," and as a way for "keeping officials elected by the people responsible to all the people whom they were selected to serve," *Tornillo*, 418 U.S. at 260 (White, J., concurring) (citation omitted), the First Amendment must protect how private actors—especially, but not exclusively, the press—choose to relay speech about those elected officials, as well as the speech of the elected officials themselves.

## II. The DTPA poses a significant risk of censorship if used to investigate or enforce the government's conception of viewpoint neutrality online.

Although Amici do not dispute that the regulation of deceptive commercial practices serves a legitimate and important government purpose, Amici do contest the specific use of consumer protection laws to hold platforms to claims of politically impartial content curation when those platforms, as here, engage in the curation of core political speech. The Supreme Court has emphasized that the permissible regulation of false or misleading commercial speech flows from certain attributes of that speech, including, for instance, that "truth of commercial speech . . . may be more easily verifiable," and that such speech displays "greater objectivity and hardiness." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n.24 (1976); *cf. id*. at 777 (Stewart, J., concurring) ("[The press] must often attempt to assemble the true facts from sketchy and sometimes conflicting sources under the pressure of publication deadlines, [while] the commercial advertiser generally knows the product or service he seeks to sell and is in a position to verify the accuracy of his factual representations . . . .").

Here, the Office of the Attorney General of Texas has explicitly stated that the focus of its investigation is whether online platforms have exercised bias in curating lawful speech. It launched the investigation a week after several technology companies, including Twitter, blocked President Trump's access to their platforms, and it specifically pointed to those actions in its news release

announcing the issuance of the civil investigative demand that Twitter challenges. *See* News Release, AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices (Jan. 13, 2021), https://perma.cc/YWJ2-3DFQ ("[J]ust last week, this discriminatory action [by "Big Tech companies"] included the unprecedented step of removing and blocking President Donald Trump from online media platforms."). Further, Texas First Assistant Attorney General Jeff Mateer has, in the recent past, expressly claimed the authority to regulate under the DTPA what he terms "bias"—by which he meant political bias—in "big tech." *See* News Release, First Assistant AG Jeff Mateer to FTC: Big Tech Companies Must Comply with State Deceptive Trade Practices Law (June 12, 2019), https://perma.cc/D83P-QF68 ("If big tech companies are not living up to their commitments and representations regarding being open to all political viewpoints and free of bias and restrictions on the basis of policy preference, then they should be held accountable for their false, misleading and deceptive trade practices."). And the civil investigative demand itself states that it is "relevant to the subject matter of an investigation of possible violations of . . . the DTPA in Twitter's representations and practices regarding what can be posted on its platform." Office of the Att'y Gen., Consumer Prot. Div., Civil Investigative Demand (Jan. 13, 2021), https://perma.cc/4FNL-Z47B.

But "bias" in content curation will necessarily be in the eye of the beholder, and claims of "impartiality" in online moderation practices are not subject to objective verification by government enforcers or courts in the same way as truly false or misleading commercial speech about a used car or a health tonic. Then-Chair of the Federal Trade Commission, Joe Simons, effectively said as much in testimony before the Senate Commerce Committee in August 2020, in response to questions regarding President Trump's executive order directing the FTC to consider whether "bias" online constituted an unfair or deceptive trade practice subject to regulation under Section 45 of the Federal Trade Commission Act, 15 U.S.C. § 45. *See* Exec. Order No. 13,925, 85 Fed. Reg. 34,079 (May 28, 2020). "Our authority focuses on commercial speech, not political content curation," Simons said. "If we see complaints that are not within our jurisdiction, then we don't do anything." *See* Leah Nylen et al., *Trump Pressures Head of Consumer Agency to Bend on Social Media Crackdown*, Politico (Aug. 21, 2020), https://perma.cc/7FLH-WDYP.

This Court recently addressed a related question—whether a platform's representations regarding openness are sufficiently factual and verifiable to state a false advertising claim under the Lanham Act. In *Prager University v. Google LLC*, the Ninth Circuit held that "braggadocio about [a platform's] commitment to free speech" is "classic, non-actionable opinion[] or puffery," and therefore cannot

support a claim under 15 U.S.C. § 1125. *See* 951 F.3d 991, 999–1000 (9th Cir. 2020); *see also Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 462 (Tex. App. 1990) (noting that puffery or opinion are non-actionable under the DTPA). Such statements do not constitute "commercial advertising or promotion," this Court held, but were made to "explain a user tool." *Prager Univ.*, 951 F.3d at 999–1000. The plaintiff in *Prager University* did not allege any facts to "overcome the commonsense conclusion" that statements related to the defendant YouTube's content moderation policies are not "advertisements or a promotional campaign." *Id.* at 1000; *see also Murphy v. Twitter, Inc.*, 274 Cal. Rptr. 3d 360, 382 (Cal. Ct. App. 2021) ("No reasonable person could rely on proclamations that '[w]e believe in free expression and think every voice has the power to impact the world,' that Twitter was the 'free speech wing of the free speech party,' or that Twitter's mission 'is to give everyone the power to create and share ideas and information instantly without barriers,' as a promise that Twitter would not take any action to self-regulate content on its platform.").

Further, it is well-settled that even non-retaliatory regulatory efforts such as selective taxation can violate the First Amendment if they burden the free flow of information to the public. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987) (finding that discriminatory taxation against the press or against certain members of the press can burden First Amendment rights with "no

evidence of an improper censorial motive"); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983) ("We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment."). "This is because selective taxation of the press . . . poses a particular danger of abuse by the State." *Ark. Writers' Project*, 481 U.S. at 228; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief.").

That danger is compounded where, as here, the target of such regulation has been identified by the regulator for perceived "bias" in political content curation. For public officials, the temptation to suppress criticism of their own or political allies' actions is strong, and so are the means by which the government may seek to tamp down that criticism, including significant civil exposure and, under other state deceptive practices laws, potential criminal liability. While one may disagree with how online platforms curate lawful content, there can be no role for the government in enforcing its conception of political orthodoxy in the name of consumer protection. *Cf. Tornillo*, 418 U.S. at 256 ("A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated."). The DTPA

serves laudable goals, but it may not be used to mandate what public officials conceive to be a standard of truth in the realm of political discourse.

## III. The suit is ripe for First Amendment purposes.

The district court erred in concluding that this suit was not ripe for adjudication. In the First Amendment context, a relaxed ripeness inquiry is not only appropriate, it itself is an essential First Amendment protection. *See Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1007 (9th Cir. 2003) (regarding law that regulated timing of political advertisements, "it would turn respect for the law on its head for us to conclude that [plaintiff] lacks standing to challenge the provision merely because [plaintiff] chose to comply with the statute and challenge its constitutionality, rather than to violate the law and await an enforcement action"); *see also Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1034 (9th Cir. 2006) (finding that plaintiff's "apprehension that the Events Ordinance would be enforced against it for engaging in activities protected by the First Amendment without a permit is sufficient to establish an injury-in-fact"); *see also Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute." (internal citations omitted)).

In the First Amendment context, the possibility of an enforcement action based on the exercise of editorial discretion presents a profound danger of chill. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."). Indeed, the Supreme Court has held that even where an enforcement action would be futile, or obviously precluded by the First Amendment, the danger of chill is sufficient to confer standing in a pre-enforcement challenge. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure."). And, for precisely that reason, the Supreme Court has gone so far as to invalidate *informal* censorship mechanisms, where a state actor has *no* enforcement authority but suggests that it would refer the matter to other authorities if a speaker does not voluntarily refrain from speaking. *See Bantam Books*, 372 U.S. at 67 ("But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim.").

These relaxed standing and ripeness standards are essential protections for the press and for other public speakers. "Only the stout-hearted will brave prosecution for the sake of publication." *Van Nuys Publ'g Co. v. City of Thousand Oaks*, 489 P.2d 809, 816 (Cal. 1971). That is, "[b]ecause of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Id.* (quoting *Dombrowski*, 380 U.S. at 486). Any statute that would permit the government to compel a news organization to disclose confidential details about its editorial processes would starkly present all of the risks recognized by the ample precedent supporting a relaxed standing or ripeness analysis in the First Amendment context. And, while communications platforms that primarily carry third-party content are not directly analogous to traditional members of the news media, they are constitutionally indistinguishable when they themselves exercise their discretion to carry or not carry speech, or to comment on or label such speech. The district court's holding on ripeness could erode the independent free speech and free press protections implicit in the relaxed standard in First Amendment cases, and should therefore be rejected.

## CONCLUSION

For these reasons, Amici urge the Court to reverse the district court's grant of Defendant-Appellee's motion to dismiss.

Dated: July 23, 2021

Respectfully submitted,

*/s/ Katie Townsend*
Katie Townsend (SBN 254321)
*Counsel of Record*
Bruce D. Brown*
Gabe Rottman*
Mailyn Fidler*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org
* *Of counsel*

*Counsel for Amici Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s): 21-15869**

I am the attorney for *amici curiae* the Reporters Committee for Freedom of the Press and Media Law Resource Center.

**This brief contains 4,776 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *s/ Katie Townsend* **Date:** July 23, 2021

**CERTIFICATE OF SERVICE**

I, Katie Townsend, hereby certify that on July 23, 2021, I served the attached document via this Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

Dated: July 23, 2021

*/s/ Katie Townsend*
Katie Townsend (SBN 254321)
*Counsel of Record*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org

*Counsel for Amici Curiae*